UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| DAN L. WHITNEY, JANET R. HADLEY, MARGARET A. KORNOW-BROWN, ERIC BRELLE,<br><br>  Plaintiffs,<br><br>  v.<br><br>CHARLES WURTZ, VERISCAPE, INC., RENEE TADLOCK, REGINA RYGELIS, WILL ARNTZ, SAM JACOB, GARY BERKOWITS, BRIAN ROE and DOES 1-20,<br><br>  Defendants. | Case No.: C 04-5232  PVT<br><br>**ORDER GRANTING  MOTION FOR SUMMARY JUDGMENT BY DEFENDANT ARNTZ** |

## I.     INTRODUCTION AND FACTUAL BACKGROUND

Plaintiffs Dan L. Whitney, Janet R. Hadley, Margaret A. Kornow-Brown and Eric Brelle (collectively, "Plaintiffs") allege breach of contract, termination, and deceit against their former employer, Defendant Veriscape, Inc.[1]  The Complaint also alleges that Defendants Charles Wurtz ("Wurtz"), Renee Tadlock ("Tadlock"), Regina Rygelis ("Rygelis"), Will Arntz ("Arntz"), Sam Jacob ("Jacob"), Gary Berkowits, and Brian Roe are liable as the alter ego of

---

[1] The holding of this court is limited to the facts and the particular circumstances underlying the present motion.

Defendant Veriscape.

On October 6, 2006, Defendants Arntz and Jacobs moved for summary judgment, claiming that there is no evidence that they are the alter egos of Veriscape and that alter ego is the sole basis for liability against them.[2]  The hearing was originally set for November 14, 2006. On October 18, 2006, Plaintiff Dan Whitney ("Whitney") moved to continue the summary judgment hearing under Local Rule 6-3, claiming that he needed additional discovery to oppose the motion.  On November 6, 2006, the Court granted Plaintiff's motion to continue the hearing.

On May 2, 2007, the parties appeared before Magistrate Judge Patricia V. Trumbull for hearing on Defendant Arntz' Motion for Summary Judgment.  For the following reason's Defendant Arntz' Motion for Summary Judgment is GRANTED.

**II.     DISCUSSION**

Veriscape sells a product called "Intellecat," which assists companies in e-procurement, or purchasing of supplies on-line.  (Arntz Decl. ¶ 4.)  Veriscape was actively involved in selling Intellecat from 2001 through 2006, but is primarily dormant now.  (Arntz Decl. ¶ 19.)  Dr. Charles Wurtz and Richard Dodd are the founders and incorporators of Veriscape.  (Arntz Decl. ¶ 3.)  Veriscape was incorporated in Delaware on May 5, 1999.  (Kravitz Decl. Exh. E, Wurtz Depo. Tr. at 8.)  At the inception of Veriscape, Charles Wurtz and Richard Dodd each owned about 5,000,000 shares. (Arntz Decl. ¶ 8.)  In September of 2001, seven months after Whitney became employed by Veriscape, Arntz invested $600,000 and became a shareholder in Veriscape. (Arntz Decl. ¶ 9.)  In March, 2002 Artnz loaned Veriscape $150,000 in return for 12% interest and 150,000 stock options at a strike price of 10 cents per share. (Arntz Decl. ¶ 11.) The loan has not been repaid and remains outstanding in full.  (*Id.*)  Arntz joined the Board of Directors in October of 2001 and remained on the board until he resigned in February of 2005. Arntz did not receive any compensation for his service on the Board.  (Arntz Decl. ¶ 10.)

Arntz resigned in February 2005 because he felt the company was not using his expertise and he had other projects demanding his time.  (Arntz Decl. ¶ 14.)  In June of 2005, Whitney

---

[2]On May 2, 2007, the Court granted Defendant Jacob's Unopposed Motion for Summary Judgment.

contacted Arntz to request him to vote his shares in favor of a takeover of the company being planned by Whitney and Dodd. Artnz informed Whitney that, due to the poor performance of Whitney and Dodd, it would not be in the shareholders' best interests to vote for the takeover. (Arntz Decl. ¶ 17.) Two weeks later, Whitney named Arntz as a Defendant in this suit.

## III. LEGAL STANDARDS

### A. Summary Judgment

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ. P. 56©. The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The burden then shifts to the non-moving party to "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Rule 56(e)). A "material" fact is one which might affect the outcome of the case under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if a reasonable jury could return a verdict for the non- moving party. *Id.* In deciding a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party, and draw all justifiable inferences in its favor. *Id.* at 255.

### B. Alter Ego Liability

Alter ego is an extreme remedy, sparingly used. *Sonora Diamond Corp. v. Superior Court*, 83 Cal.App.4th 523, 539 (2000). "In considering whether to disregard the corporate form, we apply federal substantive law, although we may look to state law for guidance." *Board of Trustees v. Valley*, 877 F.2d 769, 772 (9th Cir. 1989) *quoting Laborers Clean-Up Contract Admin. Trust Fund v. Uriarte Clean-Up Serv.*, 736 F.2d 516, 523 (9th Cir.1984); *see also Ministry of Defense of the Islamic Republic of Iran v. Gould, Inc.*, 969 F.2d 764, 769 n. 3 (9th Cir. 1992) (Noting that California law and Federal Common law on later ego liability are substantially similar). Federal law has concentrated on three factors: the amount of respect given to the separate identity of the corporation by its shareholders, the degree of injustice

visited on the litigants by recognition of the corporate entity, and the fraudulent intent of the incorporators." *Seymour v. Hull & Moreland Eng'g*, 605 F.2d 1105, 1111 (9th Cir. 1979). A plaintiff attempting to pierce the veil "must prevail on the first threshold factor and on one of the other two". *UA Local 343 v. Nor-Cal Plumbing, Inc.*, 48 F.3d 1465, 1475 (9th Cir.), *see also Board of Trustees v. Valley Cabinet & Mfg. Co.*, 877 F.2d 769, 773 (9th Cir. 1989).

At the hearing, Plaintiffs asserted that once the corporate veil was pierced as to any shareholder, all shareholders would be liable as alter egos of the corporation. Plaintiffs are mistaken; the inquiry into alter ego liability is individual:

> Before the acts and obligations of a corporation can be legally recognized as those of **a particular person**, and vice versa, the following combination of circumstances must be made to appear: First, that the corporation is not only influenced and governed by **that person**, but that there is such a unity of interest and ownership that the individuality, or separateness, of the **said person** and corporation has ceased; second, that the facts are such that an adherence to the fiction of the separate existence of the corporation would, under the particular circumstances, sanction a fraud or promote injustice

*Wood v. Elling Corp.*, 20 Cal.3d 353, 365 n.9 ( 1977), *quoting Minifie v. Rowley*, 187 Cal. 481, 487 (1921) (emphasis added); *see also American Home Insurance Co. v. Travelers Indemnity Co.*, 122 Cal.App.3d 951 (1981) ("The fraud or inequity sought to be eliminated must be that of the party against whom the alter ego doctrine is invoked, and 'such party must have been an actor in the course of conduct constituting the "abuse of the corporate privilege' ")(citation omitted). Passively receiving the benefit of a fraud is insufficient to establish alter ego liability. The application of the alter ego doctrine is limited to "individuals who influence and govern the corporation or who were actors in the course of conduct constituting the abuse of the corporate privilege." *Firstmark Capital Corp. v. Hempel Financial Corp.*, 859 F.2d 92, 95 (9th Cir. 1988)(overruling finding of alter ego liability for spouse of controlling party)(citation omitted). Accordingly, unless Plaintiffs can raise a genuine issue of fact as to Defendant Arntz having control of the corporation or participating in conduct that is an abuse of the corporate form, summary judgment is appropriate.

**IV.   DISCUSSION**

Defendant Arntz moves for summary judgment, claiming there are no facts to support

Plaintiffs' claim that he is the alter ego of Veriscape.  Plaintiffs oppose summary judgment, claiming that the following factors raise a genuine issue as to whether Arntz was the alter ego of Veriscape: 1) Arntz wielded day-by-day power, despite not being an Officer or Employee; 2) Veriscape employees commingled funds and diverted corporate assets; 3) Veriscape was undercapitalized; 4) Veriscape failed to follow corporate formalities; and 5) Veriscape is perpetrating a "huge" fraud and Injustice on Plaintiffs.

**A.     Respect Given to Separate Identity of Corporation**

Before a court will impose alter ego liability, it must find "such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist." *Associated Vendors, Inc. v. Oakland Meat Co.*, 210 Cal.App.2d 825, 837 (1962) *citing Automotriz etc. De California S. A. De C. V. v. Resnick*, 47 Cal.2d 792, 796 (1957); *see also RRX Indus., Inc. v. Lab-Con Inc.*, 772 F.2d 543, 545 (9th Cir. 1985).  Plaintiffs allege four types of failure to respect the corporate identity: 1) domination and control by Arntz; 2) commingling of funds and diversion of assets; 3) undercapitalization and loans from shareholders; and 4) failure to follow corporate formalities.

1.     <u>Arntz Domination and Control Evidence</u>

Plaintiffs assert that Arntz was "in control of the corporation" and wielded "day-by-day power." (Opp. at 6.)  Although not entirely clear,  Plaintiffs' argument appears to be that Arntz dominated the corporation by joining his shares with Defendant Wurtz' shares.  Arntz owns 2,200,000 shares, or 17.5% of the stock .  (Exh. P.)  Plaintiffs argue that Arntz' 17.5%, when combined with Wurtz' 5,000,000, or 39.8% , is a control block because they are friends who share the same spiritual beliefs.  Plaintiffs also argue that "Wurtz and Arntz always voted with each other."  (Opp. at 6.)  However, Plaintiffs rely on deposition testimony from Defendant Jacob that states it is "fair to assume that Artnz, when he owned stock, would have voted with Wurtz." (Jacob Depo at 39.)  Thus, the evidence, at most, tends to show that Wurtz controlled or dominated the corporation, an issue not before the court.

Plaintiffs next allege: "When Arntz wanted a 39.8% shareholder, board member and president removed from the board, it happened." (Opp. at 7.)  Apparently, Plaintiffs are arguing

1  that Arntz orchestrated the removal of Dodd from the Board of Directors. Plaintiffs rely upon
2  the deposition testimony of Wurtz. The testimony, however, does not raise any genuine issue as
3  to Arntz' domination or control of Veriscape. Wurtz testified that he found Dodd incompetent
4  on a variety of fronts and that Wurtz was the one who fired Dodd for trying to make a deal that
5  would have bankrupted the company. (Wurtz Depo Tr. at 24). Again, at most, this evidence
6  tends to show that Wurtz controlled the corporation.

7  Plaintiffs next assert: "When Arntz wanted C.O.O. Tadlock fired, it happened." Plaintiffs
8  cite to Wurtz and Tadlock deposition transcripts.[3] Wurtz testified that when he asked Arntz to
9  loan Veriscape more money, Arntz said he would only loan the money if Tadlock were fired.
10 (Wurtz Depo. Tr. 30.) Granting plaintiffs the benefit of every inference, the ability to condition
11 additional investment on the termination of the Chief Operating Officer is some evidence of
12 control over the company.

13 Plaintiffs also assert: "When Arntz wanted Wurtz to step down as CEO, it happened."
14 Plaintiff relies on Wurtz' deposition testimony. Wurtz testified that he was unwell and Arntz
15 asked him to voluntarily step down. (Wurtz Depo. at 21, 23, 130-131). Then Wurtz, Arntz, and
16 Dodd (as a director and secretary) had a phone call in which they unanimously voted to have
17 Rygelis become CEO in addition to her position as President. (Wurtz Depo at 130-131.) Thus,
18 the evidence shows that Wurtz voluntarily agreed to step down in favor of his long time
19 companion.[4] Again, granting Plaintiffs every reasonable inference, this is some evidence that
20 Arntz dominated or controlled the corporation.

21 Plaintiffs also assert that Arntz was "very involved in day-to-day activities." As proof,
22 they point to Arntz taking responsibility from Whitney for negotiations for the sale of Intellecat
23 to a company called E-plus. (Whitney Decl. ¶¶ 3-6, Exh 19-4). Plaintiffs argue that Arntz'
24 assumption of responsibility for negotiation for the sale of the company's only product is proof

---

[3] The Tadlock deposition testimony is not competent evidence. Tadlock testified that Wurtz told her that Artnz asked that she be terminated. (Tadlock Depo Tr. at 23.) This statement by Tadlock of a statement by Wurtz of a statement by Arntz is hearsay. Accordingly, the court has not considered this evidence.

[4] Rygelis and Wurtz have lived together for six years. (Rygelis Depo. 55-56.)

ORDER, *page 6*

that Arntz exercised control over "day-to-day" activities.  Sale of the sole product, however, is not a day-to-day activity.  Nonetheless, again granting all inferences for Plaintiffs, it is evidence that Arntz was involved in important corporate matters.

Plaintiffs argue that the day-to-day involvement persisted from 2002-2004.  Plaintiffs offer the following evidence.  First, a memo from Whitney to Rygelis citing Board involvement in day-to-day activities.  (Exh. 14-1)  Whitney claims he was referring to Arntz, but was afraid to mention him by name and that he was getting orders from Arntz that contradicted information he got from Wurtz or Rygelis.  (Whitney Decl. ¶ 8).  Whitney does not provide any information as to any orders he received from Artnz.  Second, Whitney was instructed to provide to Arntz (among other people) copies of emails to his "personnel reports" advising them that no employee may make any offer or contract to any other employee or outside party without getting approval from legal, Wurtz, and Rygelis.  (Exh. 14-2).  Third, the board of directors, of which Arntz was a member, received sales reports.   (Exh. 14-7).  Fourth, Artnz received a copy of an email about what terms in what documents constitute a binding contract.  (Exh. 14-5-6).  Fifth, Arntz wanted to be involved in "reseller model creation", which Plaintiffs characterize as how to put together a certain sale.  (Exh. 14-4, Whitney Decl. ¶ 9).  Finally, Rygelis sent an e-mail to Whitney that says  "We are being slightly micro-managed at the moment and Chuck thought it best to have Will [Arntz] review John's comments." (Exh. 43.)  Rygelis testified at her deposition that John was responsible for "managing third parties" and Arntz had experience in that area and "we wanted to make sure we talked to Will [Arntz], and Will may have expressed interest in that subject matter." (Rygelis Depo. 110-111.)

Summarizing all of the above facts, and granting Plaintiffs every reasonable inference, Plaintiffs have provided evidence that: 1) Arntz conditioned additional investment on the removal of C.O.O. Tadlock; 2) upon Artnz' suggestion, Wurtz voluntarily resigned for health reasons, to be replaced by Wurtz' long time companion; 3) Whitney complained about board involvement, when he meant Arntz involvement; 4) Arntz took over negotiations for the sale of Intellecat and wanted input in how to put another sale together; 5) Arntz received copies of documents in his capacity as a member of the Board of Directors; and 6) Rygelis and Wurtz

1  wanted Arntz involved in discussions about management of third parties.  Even giving Plaintiffs
2  the benefit of every reasonable inference, the evidence presented could not lead a reasonable jury
3  to conclude that Arntz dominated or controlled Veriscape.

### 2. Commingling of Funds/Diversion of Corporate Assets

Plaintiffs assert that a question as to diversion of corporate assets is raised by the fact that Tadlock invoiced "four to seven" customers, but she could only name two: Bank of America and Engelhard.  (Tadlock Depo Tr. at 58-59.)  Tadlock testified that she was not involved in sales, only invoicing and that "I really have no idea" how many invoices.  When pressed, she estimated it was "more like four or five, six or seven, but not twenty."  (Id.)  Plaintiffs' evidence of commingling is that sales documents produced by Veriscape do not show any sales to Englehard or the other two to five other sales by Tadlock.  However, this does not raise a genuine issue as to commingling or diversion, because there is no evidence that any money was received in response to the invoices, if indeed there were more than two invoices sent.  Moreover, Plaintiffs have produced no evidence that raises any question as to diversion of assets by Arntz.  Plaintiffs assert that they can probe the issue at trial, since discovery is closed.  However, Plaintiffs must produce sufficient evidence now to avoid summary judgment, not speculation of evidence that might be developed at trial.

Plaintiffs next argue that Tadlock took loans from the company, and argue that even though she paid the loans back, she co-mingled.  Plaintiffs do not assert that Arntz was involved in any way in these loans.  Plaintiffs appear to argue that any wrongdoing by any board member is evidence that Artnz is the alter-ego of Veriscape.  However, as discussed above, the Plaintiffs must show that Arntz participated in the conduct constituting the abuse of the corporate form.  Accordingly, Plaintiffs have failed to raise any genuine dispute as to commingling or diversion by Arntz.

### 3. Undercapitalization/Loans from Shareholders

#### a. There is no evidence of initial undercapitalization

Veriscape was incorporated in Delaware on May 5, 1999.  (Kravitz Decl. Exh. E, Wurtz Depo. Tr. at 8.).  Mr. Dodd initially invested at least $100,000 (Kravitz Decl. Exh. E, Wurtz

1  Depo. at 10.)[5] By June of 2000, Veriscape had raised just under a million dollars from 65
2  investors. (Id. at 13.) Additionally, Arntz invested $250,000 in February, 2001 and $350,000 in
3  August, 2001. (Id. at 12-19.) Moreover, in 2002, Veriscape obtained over $850,000 in loans.
4  (Id. at 17-18.) Thus, Veriscape obtained $2.7 million during its first two years.

5  Plaintiffs do not establish what amount of money would have been necessary for
6  adequate capitalization and do not submit any evidence showing that the initial funding was
7  inadequate. Plaintiffs submitted evidence of financial difficulties and lack of money, but not at
8  the inception of the business in 1999. *See* Exh 23 (November 2001 lack of money to repay
9  expenses); Exhs. 40, 41 (September 2002 requests for payment to Ariba); Exh. 44 (June, 2004
10  notice of rent overdue on California office). When a corporation is adequately funded at the
11  outset, bad financial times later do not raise an inference of fraudulent intent. *Seymour*, at 605
12  F.2d at 1113.

13                                b.        Shareholder loans

14  Plaintiffs next argue that loans to the corporation from the shareholders is evidence of
15  unity between the corporation and the shareholder and evidence of an inequitable result if the
16  corporate form is respected. Plaintiffs cite *Riddle v. Leuschner* (1959) 51 Cal.2d 574, 581 and
17  *Linco Servs. Inc. v. Dupont* (1966) 239 Cal.App.2d 841, 844 in support of this proposition.
18  Neither case stands for the extraordinary proposition that shareholder loans to a corporation,
19  absent special circumstances, are evidence to support alter ego liability. The *Riddle* court found
20  alter ego liability based on a pattern of treating the corporate assets as individual assets. The
21  *Linco* court reluctantly upheld the finding of the trial court of alter ego liability based on a loan
22  from the defendant. The defendant allowed an unsound company to resume business "clothed in
23  the appearance of financial stability" and then refused to advance the money as promised. Thus,
24  the court found it would be inequitable to allow the individual to escape liability for deals he
25  //
26  //

27  ─────────────────
28  [5]Wurtz testified that Dodd purported to contribute and additional $100,000, but did not actually provide the money.

induced the public to make with the corporation.[6]

In this case, however, there is no evidence that the loans to Veriscape were promised, but not delivered, in order to induce people to deal with the company. Accordingly, the loans do not raise a question as either unity of interest or inequitable result.

#### 4. Failure to Follow Corporate Formalities

Plaintiffs assert that Veriscape failed to follow corporate formalities because Veriscape:

1) Is not registered to do business in New Mexico or California and had its registration to do business in Colorado revoked;

2) does not have an executed set of bylaws

3) did not have any annual shareholder meetings, as required by the bylaws; and

4) failed to maintain minutes of board meetings as required by Delaware and New Mexico law.

Arntz claims that these are either irrelevant or "carelessness" which does not rise to the level necessary to disregard the corporate form. *Audit Servs, Inc. v. Rolfson et al.*, 641 F.2d 757 (9th Cir. 1981). In *Audit Services*, the defendant "disregarded such corporate formalities as shareholders' or directors' meetings" and "commingled his assets with those of the corporation." The court found that: "While the evidence showed that [defendant] was somewhat careless in failing to observe the strict formalities of the corporate form, it fell far short of demonstrating any deliberate misuse of the corporation or any fraudulent intent in forming it." *Id.* at 764; *see also Seymour*, 605 F.2d at 1112 (excusing "a degree of informality" in the absence of "more serious forms of abuse" such as commingling); *Ministry of Defense of the Islamic Republic of Iran v. Gould, Inc.*, 969 F.2d 764, 769 (9th Cir. 1992) (isolated failures do not establish a genuine issue as to corporate formality.)

##### a. Registration Problems

Arntz argues that Veriscape did not need to be registered in California, New Mexico, or

---

[6]To the extent that *Linco* can be read to hold that shareholder loans, absent special circumstances, are proof of alter ego liability, the court declines to follow that holding. Indeed, under this logic, Whitney could be held liable as the alter ego of Veriscape as he loaned the corporation $10,000. (Whitney Decl. ¶ 20; Exh. 11.)

1  Colorado because a business need only register if it intends to conduct business in that state.
2  Plaintiffs have not provided any evidence that Veriscape conducted business in Colorado.
3  Accordingly, there is no evidence that the failure to register in Colorado was improper.  Artnz
4  claims that Veriscape is registered to conduct business in New Mexico and provides a certificate
5  in good standing dated August, 2006.  (Supp. Kravitz Decl. ¶ 3, Exh. W.)  However, Plaintiffs
6  provide evidence of a problem with the New Mexico registration in 2005 (Weems Aff, Exh A to
7  Beck Decl.)  Additionally, the presence of an office in California without registration is evidence
8  of failure to follow corporate formalities.  Artnz argues that the lack of registration is minor,
9  citing *Aronson v. Price*, 644 N.E.2d 864 (Ind. 1994)(failure to file fictitious name certificate
10 insufficient to impose alter ego liability).  Minor problem or not, the failure to properly register
11 is evidence of failure to respect the corporate form.

                b.      Bylaws were Executed

13 Artnz argues that he produced a properly authenticated copy of Veriscape's bylawas as
14 Exhibits N and O to his motion.  Plaintiffs claim the bylaws are ineffective because page 6 is
15 missing and they are unsigned (Beck decl par 10, exh 29).  A missing page in Plaintiffs' copy is
16 irrelevant.  Additionally, the Consent of Directors adopted the bylaws. (Exhibit N).   Thus, the
17 bylaws provide no evidence of failure to follow corporate formality.

                c.      Shareholder Meetings

19 Plaintiffs provide evidence that shareholder meetings were not held. (Artnz Depo. At 48;
20 Tadlock Depo. At 21; Rygelis at 93-94).  Artnz does not address this issue.  Accordingly, the
21 lack of shareholder meetings is evidence of failure to follow corporate formalities.

                d.      Board Meetings Minutes

23 Plaintiffs argue that Veriscape did not keep minutes of Board Meetings and cite to
24 responses to requests for production.  (Beck Decl. Exh. E.)  However, the requests did not seek
25 Board Minutes; instead they sought any writings transmitted by any board member to any officer
26 relating to any plaintiff and any writings transmitted by any officer to any board member relating
27 to the sale or lease of Intellecat.   Accordingly, the document request responses are not evidence
28 of failure to keep board minutes.  Moreover, Arntz provided "notes" that Jacobs took at a March

19, 2003 Board Meeting. (Jacob decl ¶ 9, Exh. S) The notes, however, are not extensive. Accordingly, the most Plaintiffs have shown is that the minutes of the board of director's meetings may have been inadequate.

In summary, the evidence of lack of observing corporate formalities is: 1) not registered in California (and at some point in New Mexico); 2) no shareholder meetings; and 3) inadequate minutes of board meetings. Granting Plaintiffs the benefit of every doubt, these failures do not amount to more than carelessness and do not raise a genuine dispute as to either the separate identity of the corporation or any deliberate misuse of the corporate form.

**B.     Injustice to Litigants by Recognition of Corporate Format**

Plaintiffs must show a genuine dispute as to whether they would suffer injustice from respecting the corporate form. Plaintiffs argue "Veriscape is perpetrating a Huge Fraud and Injustice" upon them. (Opp. At 15.)  Plaintiff Whitney and Veriscape dispute the terms of Whitney's contract and Whitney's authority to hire the other plaintiffs. Plaintiffs argue that Veriscape is disputing the terms of Whitney's employment contract in order to avoid paying him money due and wrongfully terminated Whitney to avoid paying future commissions. Similarly, Plaintiffs argue that Versicape is wrongfully repudiating the employment contracts of Hadley, Brown and Brelle  in order to avoid paying salary due.  Plaintiffs also argue that Veriscape has acted injustly in applying the terms of all of the Plaintiffs' employment contracts. Plaintiffs' contracts contained a clause stating that salary will begin  "when corporate revenues are such that Company deems it may provide a full time salary" *See e.g.,* Exh. 2.  Plaintiffs argue that the company improperly failed to "deem" revenues sufficient because the financial statements show current assets.[7]

Plaintiffs' sole argument of injustice justifying piercing the corporate veil appears to be that Veriscape is unjustly denying them due compensation. Fraud, or injustice, in the running of the business is not sufficient to pierce the corporate veil. "Instead, the plaintiffs must show that the 'shareholder misused the corporate form to perpetrate the[ ] fraud.'" *UA Local 343 United*

---

[7]This argument appears to contradict Plaintiffs' argument that Veriscape was underfunded.

*Ass'n of Journeymen & Apprentices of Plumbing and Pipefitting Industry of U.S. and Canada, AFL-CIO v. Nor-Cal Plumbing, Inc.*, 48 F.3d 1465, 1476 (9th Cir. 1994) (citation omitted.) Plaintiffs do not address how recognition of the corporation format works any injustice on them and have, therefore, failed to show a genuine issue on this element.

Plaintiffs asserted a lack of funding and may have meant to argue that Veriscape owes Plaintiffs money that they will be unable to collect if the veil is not pierced as to Arntz. A plaintiff's inability to collect a judgment from an insolvent defendant, by itself, does not constitute an unjust result. *Seymour*, at 605 F.2d at 1113 (upholding District Court's refusal to pierce the veil). Moreover, Plaintiffs have not submitted any evidence of Veriscape's present inability to satisfy a judgment. Plaintiff has submitted balance sheets from 2002, 2003 and 2004 showing that Veriscape was increasingly insolvent in all three years. (Sealed Exh. 30-2.) Plaintiffs, however, have submitted no evidence of current inability to pay.

Plaintiffs also argue that Wurtz said: 1) "Arntz had assured all employees would be paid in full" and 2) Arntz "would match the amount of sales with investments of capital up to the amount necessary to pay the salaries." Whitney Decl. (¶ 23, Exh. 34-1.) To the extent that Plaintiffs are arguing that it would be unjust to allow Arntz to make this promise and not to keep it, this argument fails. Plaintiffs cite Whitney's declaration as proof. The Whitney Declaration states that Wurtz said Arntz "had assured that all employees would be paid in full." The Whitney Declaration also states that Wurtz said that Arntz would match sales with investment up to the amount necessary to pay salaries. Arntz properly objected to this part of the declaration because it is hearsay. The statement of Wurtz can only be used as a party admission against Wurtz, as the speaker. Fed. R. Evid. 801. Here, Plaintiffs are trying to use Wurtz' retelling of what Arntz said against Arntz. This is impermissible hearsay.[8] Plaintiffs also cite to an e-mail from Wurtz. The email, however, does not state Arntz promised anything. Instead, it states: "Veriscape has several high net worth individuals behind it. We have tried to avoid additional investment to prevent our current shareholders from becoming highly diluted, but we are still

---

[8] Arntz made many other evidentiary objections. Except as noted in this Order, all other objections are overruled as either improper or irrelevant.

here." Exh. 34-1). Thus, there is no admissible evidence as to any promise by Arntz to provide money for salaries. Accordingly, Plaintiffs have failed to raise a genuine dispute as to any injustice that would arise from recognition of the corporate form.

### C. Fraudulent Intent of Incorporators

As discussed above, the Veriscape was not a mere shell corporation. The undisputed evidence shows Veriscape raised just under a million dollars of capital in its first year and obtained $2.7 million during its first two years. (Wurtz Depo. 12-19). Veriscape's later financial situation does not raise an inference of fraudulent intent. *Seymour*, at 605 F.2d at 1113. Moreover, the company was actively engaged in selling Intellecat from 2001-2006. (Arntz Decl. ¶ 19.) "The very fact of continuing to do business for a period of at least five years tends to indicate a good faith use of the corporation to conduct a legitimate business enterprise." *Seymour*, at 605 F.2d at 1113. Moreover, Arntz was not involved in any way in the formation of Veriscape. (Artnz Depo. ¶¶ 3, 7-9). Thus, he can have had no fraudulent intent at incorporation.

Accordingly, Plaintiffs have failed to raise a genuine dispute over fraudulent intent at incorporation sufficient to hold Arntz liable as the alter ego of Veriscape.

### V. CONCLUSION

For the foregoing reasons, It Is Hereby Ordered that Arntz' Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED

Dated: June 1, 2007

PATRICIA V. TRUMBULL
United States Magistrate Judge